Counsel of Record:
ANDREW M. CALAMARI
Regional Director
Attorney for the Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
Brookfield Place, 200 Vesey Street, Suite 400
New York, New York 10281
(212) 336-1023 (Brown)
Email: BrownN@sec.gov

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

-----------------------------------------------------------------------x

**SECURITIES AND EXCHANGE COMMISSION,** :
                                     :

               **Plaintiff,** :      **15 Civ.   (  )**

                                       :

   **-against-** :      **COMPLAINT**

                                       :

**MIKE TAXON and ITAMAR COHEN,** :

                                       :

              **Defendants.** :

-----------------------------------------------------------------------x

      Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against

Defendants Mike Taxon ("Taxon") (who resides at 696 Oriole Parkway, Toronto, Ontario

M4R2C5, Canada) and Itamar Cohen ("Cohen") (who resides at 81 Townsgate Dr., Apt. 207,

Thornhill, Ontario L4J8E6, Canada), alleges:

<u>SUMMARY</u>

      1.     This case involves two penny stock manipulation schemes that Taxon and Cohen,

then partners in a stock promotion business called Maxwell Network Group, Inc. ("Maxwell

Network"), perpetrated together with a third participant, a trader from New York (the "Trader").

The first scheme was perpetrated in 2007 and involved the stock of Raven Gold Corporation

("RVNG"), a purported gold and silver exploration company.  The second scheme was

perpetrated in 2007-2008 and involved the stock of Kentucky USA Energy, Inc. ("KYUS"), a company involved in natural gas production.  In addition to market manipulation and fraudulent promotion, the schemes involved illegal unregistered offerings of the issuers' stocks, and, together, generated over $17 million in illegal gross stock sale proceeds as well as substantial profits for the schemes' participants.

2.      In the RVNG scheme, Taxon and Cohen were hired to promote the RVNG stock by the persons who controlled the company in exchange for the majority of the company's purportedly unrestricted shares.  Taxon and Cohen then recruited the Trader to collaborate with them on the promotion and manipulation in exchange for a portion of their newly-acquired RVNG shares.  Taxon, Cohen and the Trader (together, the "Promoters") then proceeded to manipulate the market for RVNG stock by placing trades and trade orders intended to create a false appearance of liquidity, market depth, and demand for the stock.

3.      In addition, the Promoters created and distributed a glossy promotional "newsletter" touting RVNG stock (the "RVNG Mailer").  The RVNG Mailer was not a publication by "Stock Trend Report," as it purported to be; rather, it was financed by the Promoters with proceeds from the sale of some of the RVNG stock that they had received as compensation for the promotion.  The RVNG Mailer contained multiple materially false or misleading statements or materially misleading omissions, including, among other things, statements or omissions about the Promoters' identity, compensation, and control of the issuer's stock.

4.      Finally, to increase the appearance of active market demand for the stock, the Promoters handed out free blocks of RVNG stock to their friends and acquaintances as kick-backs for open-market transactions in RVNG stock.

5.     In the KYUS scheme, the Trader was recruited to promote the stock by the individuals who controlled the issuer, and he invited Taxon and Cohen to participate and help finance the scheme, in exchange for a share of the ultimate profits.  The Trader used the funds provided by Taxon and Cohen to obtain control of a substantial block of the company's purportedly unrestricted shares and used proceeds from the illegal unregistered sales of the stock to finance the promotion.

6.     Similar to the RVNG scheme, the KYUS scheme involved manipulative trades intended to create the appearance of liquidity and market demand and a glossy promotional newsletter – this time, a "Special Edition for Premium Members" supposedly distributed by "Global Investor Watch" (the "KYUS Mailer").  Just like the RVNG Mailer, the KYUS Mailer contained materially false or misleading statements or materially misleading omissions, including, among other things, statements and omissions about the Promoters' identity, compensation, and control of the issuer's stock.

7.     By engaging in these schemes, Taxon and Cohen violated the securities registration requirements of the Securities Act of 1933 ("Securities Act").  Taxon and Cohen also violated the anti-fraud provisions of the Securities Act and violated or aided and abetted the violations of the anti-fraud provisions of the Securities Exchange Act of 1934  ("Exchange Act").

## NATURE OF THE PROCEEDING AND RELIEF SOUGHT

8.     The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act, 15 U.S.C. § 77t(b), and Section 21(d)(1) of the Exchange Act, 15 U.S.C. § 78u(d)(1), seeking a final judgment: (a) permanently restraining and enjoining each of Taxon and Cohen from engaging in the acts, practices and courses of business alleged

herein; (b) requiring each of Taxon and Cohen to provide an accounting and to disgorge ill-gotten gains and to pay prejudgment interest thereon; (c) imposing civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3); and (d) permanently prohibiting each of Taxon and Cohen from participating in any offering of penny stock pursuant to Section 20(g) of the Securities Act, 15 U.S.C. § 77t(g), and Section 21(d)(6) of the Exchange Act, 15 U.S.C. § 78u(d)(6).

### JURISDICTION AND VENUE

9.      The Court has jurisdiction over this action pursuant to Sections 20(b) and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b) and 77v(a), and Sections 21(d) and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d) and 78aa.

10.      Venue lies in this District pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  Some of the acts, practices, courses of business and transactions constituting the violations alleged herein occurred within the District of New Jersey.  For example, the Promoters sold unregistered RVNG and KYUS securities and executed manipulative trades in those securities, in part, through broker-dealers located in the District of New Jersey, and using trading systems operated through servers in the District of New Jersey.

11.      Taxon and Cohen, directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce, or of the mails, or of a facility of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged herein.

## DEFENDANTS

12.     **Taxon**, age 52, resides in Toronto, Ontario, Canada.  Between 2007 and 2008, at the time of the events alleged herein, Taxon, together with his partner Cohen, ran Maxwell Network, a penny stock promotion business.

13.     **Cohen**, age 52, resides in Thornhill, Ontario, Canada.  During the relevant time, Cohen was Taxon's partner at Maxwell Network.

## ISSUERS

14.     **Raven Gold Corporation ("RVNG")** was a Nevada corporation.  During the scheme alleged herein, RVNG's headquarters were in Vancouver and Penticton, British Columbia, and its common stock was quoted on the OTC Bulletin Board ("OTCBB") and was a "penny stock" as that term is defined in Section 3(a)(51) of the Exchange Act, 15 U.S.C. § 78c(a)(51), and Rule 3a51-1 thereunder, 17 C.F.R. § 240.3a51-1.

15.     **Kentucky USA Energy, Inc. ("KYUS")** was a Delaware corporation headquartered in London, Kentucky.  During the scheme alleged herein, KYUS represented that it was engaged in shale gas exploration in western Kentucky.  During the scheme alleged herein, its common stock was quoted on the OTCBB and was a "penny stock" as that term is defined in Section 3(a)(51) of the Exchange Act, 15 U.S.C. § 78c(a)(51), and Rule 3a51-1 thereunder, 17 C.F.R. § 240.3a51-1.

## FACTS

### I.    THE RVNG SCHEME

#### A.    RVNG's Corporate Background

16.    RVNG was incorporated in Nevada in or about February 2005, under the name Riverbank Resources, Inc. In its public filings, the company claimed that it was in the business of mineral exploration. In reality, however, the company was a shell created and controlled by a British Columbia attorney engaged in the business of creating and selling shell companies.

17.    In April 2005, the company conducted two unregistered offerings of a total of 7.424 million shares of its common stock under Regulation S. The individuals who received the stock in the offerings, including the company's purported officers and directors, were nominees of the attorney who had created the shell, and not true owners of the stock.

18.    In or about July 2005, the company filed with the Commission a registration statement on Form SB-2, purporting to register resale of 3.424 million shares held by individuals other than the company's purported officers and directors. The registration statement became effective in or about September 2005.

19.    Sometime between September 2005 and approximately August 2006, a pair of penny stock promoters from Canada (the "RVNG Owners") bought the Riverbank Resources shell from the attorney who had created it. Subsequently, to effectuate the sale, the original nominee shareholders transferred their shares to the RVNG Owners' various designees, including, as discussed below, Taxon, Cohen and the Trader. These transfers were not directed by the shareholders themselves; instead, the individuals who controlled the issuer – first, the attorney who had created the shell and then the RVNG Owners – directed all the transfers.

20.      In or about August 2006, the company, now controlled by the RVNG Owners, changed its name to Raven Gold Corporation, carried out a 5:1 stock split, and announced a change in management.  In September 2006, the company announced that it had "decided to discontinue" mineral exploration at its British Columbia property.  In or about March 2007, RVNG carried out a 2:1 split of its common stock.

21.      As a result of the stock splits in 2006 and 2007, as well as additional restricted stock issuances directed by the RVNG Owners during this time period, during the stock manipulation scheme alleged below, RVNG had approximately 75 million shares of common stock issued and outstanding, of which approximately 34 million shares were traceable to the April 2005 Regulation S offerings and purportedly covered by the subsequent resale registration statement.

22.      In or about March 2007, RVNG common stock began trading on the OTCBB under its new symbol, "RVNG."

23.      During the stock manipulation scheme alleged below, the RVNG Owners had complete control of RVNG and its management.

**B.      Taxon and Cohen's RVNG Stock Promotion Deal**

24.      In early 2007, the RVNG Owners met Taxon and Cohen through a common acquaintance and proposed that Taxon and Cohen promote RVNG stock.  Taxon and Cohen then reached out to the Trader and invited him to participate in the "deal."

25.      In the course of the following few weeks, the RVNG Owners agreed to give Taxon and Cohen a large block of purportedly unrestricted RVNG shares in exchange for a stock promotion campaign consisting of a promotional mailing, other advertising, and manipulative trading that would create the false impression of liquidity and active interest in the stock.  In

7

turn, Taxon and Cohen agreed that the Trader would help them execute the key aspects of the promotion, including the advertising campaign and the manipulative trading, in exchange for a portion of Taxon and Cohen's cut of the stock.  The Promoters also agreed that they would sell a portion of their RVNG stock holdings to finance the upcoming advertising campaign.

26.     To put these plans in motion, between mid-May and mid-June 2007, the RVNG Owners directed transfers of eighty percent of RVNG's purportedly unrestricted stock (approximately twenty-seven million shares) to accounts controlled by the Promoters.  Of that eighty percent, sixty percent (approximately twenty million shares) represented the Promoters' compensation, and the remaining twenty percent (approximately seven million shares) was parked in an offshore account under Taxon's control for the duration of the promotion – a term that Taxon and Cohen negotiated with the RVNG Owners, to ensure that the RVNG Owners would not dump large quantities of RVNG stock behind the Promoters' backs, and thus undermine the Promoters' efforts to drive up the stock price and sell the Promoters' shares at a high price.

27.     To obscure their connection to and control of the majority of the purportedly unrestricted RVNG stock, the Promoters did not deposit their RVNG stock in U.S.-based accounts held in their own names.  Instead, the share blocks were deposited in U.S. brokerage accounts held in the names of several offshore brokerage firms where the Promoters had accounts.

C.     **Manipulative Trading and Fraudulent Promotion of RVNG Stock**

28.     On receiving their blocks of RVNG shares, the Promoters embarked on a promotional campaign for the stock, which consisted of manipulative trading, a promotional mailer, and advertisements placed in multiple news publications.  Taxon and the Trader took the

lead in the areas of manipulative trading and in the creation of the advertising materials.  Cohen, consistent with his typical role at Maxwell Network, focused on the operational support, such as transfers of funds and stock in furtherance of the scheme.  The RVNG Owners supported the promotion by ensuring a steady stream of favorable company press releases.

### 1.  Manipulative Trading and Kick-Backs

29.     In June and July 2007, Taxon and the Trader directed manipulative trades in RVNG stock.  Taxon's and the Trader's RVNG stock trading in June and July 2007 was intended to achieve two primary goals.  First, Taxon and the Trader sold RVNG stock to generate cash to fund the promotional mailing and advertising that would follow in July 2007.  Second, Taxon and the Trader traded RVNG stock between their various accounts in order to create the false appearance of liquidity and active interest in the stock – in substance, an attractive (but fake) price and volume history for investors who would be researching the stock after seeing the upcoming promotional mailer or advertisements.

30.     To amplify the false appearance of increased liquidity and market interest in the stock, the Promoters reached out to their acquaintances among penny stock traders and promoters and offered to provide free blocks of RVNG stock as kick-backs for open market transactions in RVNG stock.  For example, on or about July 19, 2007 and August 20, 2007, Taxon and Cohen transferred 5,000 and 25,000 RVNG shares, respectively, from one of their offshore accounts to the accounts of one of the Trader's acquaintances.  That acquaintance bought approximately 101,500 shares of RVNG in the open market in June and July of 2007, and sold all of his RVNG shares – those received as a kick-back and those bought in the open market – by early September of 2007, making a profit of approximately $25,600.

2.      **The RVNG Mailer and Media Advertisements**

31.      The centerpiece of the RVNG promotion was the RVNG Mailer – an eight-page glossy "newsletter" touting RVNG stock that the Promoters distributed in mid-July 2007 under a fake entity name, "Stock Trend Report."

32.      The RVNG Mailer contained multiple materially false or misleading statements. For example, the mailer was purportedly published by an entity named "Stock Trend Report" and claimed to be a July 2007 "Special Edition of Premium Members." In reality, Stock Trend Report was an entirely fictional name created specifically for the RVNG campaign, with no prior or subsequent "editions."

33.      Additionally, the RVNG Mailer's cover page claimed that RVNG stock had been "seen on" CNBC, Bloomberg, in the Wall Street Journal, the New York Times, and in other respected news publications, creating the impression that the stock had been a subject of reporting in those publications. In reality, the stock had only been "seen" in those publications in paid advertisements placed by the Promoters.

34.      These misstatements were material because they lent the RVNG Mailer an aura of legitimacy and reliability, and helped conceal the fact that it was an advertisement placed on behalf of and in coordination with the RVNG Owners.

35.      The RVNG Mailer also touted the stock's "strong move upward" in "recent weeks," which the RVNG Mailer attributed to the company's strong business prospects. A chart covering the time period from early May to mid-June of 2007 purportedly showed the stock's "remarkable uptrend so far." These statements were materially misleading. The RVNG Mailer failed to disclose that a substantial portion of the touted market activity consisted of the trades placed by Taxon, the Trader and those acting in concert with the Promoters, which were

executed for the very purpose of creating an attractive price and volume history for the stock, not because of legitimate, independent market interest.

36.     The mailer's last page contained a warning:  "Please note:  Due to high market demand for RVNG by institutional investors, some brokers may require you to phone in your order."  This statement was materially false:  No "high market demand for RVNG by institutional investors" existed.

37.     The RVNG Mailer contained a fine-print disclaimer that purported to disclose the compensation received by the mailer's publisher and the publisher's motivations and intentions with respect to the stock.  The disclaimer was itself materially false and misleading.

38.     For example, the disclaimer continued to attribute the RVNG Mailer to "Stock Trend Report," a nonexistent entity.

39.     The disclaimer also stated that the company, RVNG, had "not approved the statements made in this opinion."  In reality, the RVNG Owners, who controlled the company and its management, had seen drafts of the mailer and had signed off on its content.

40.     On the subject of compensation, share ownership, and intent to sell with respect to RVNG stock, the disclaimer stated that Stock Trend Report "has been compensated by third party shareholders or with cash from the company on behalf of one or more of the companies mentioned in this opinion . . . for dissemination of this advertisement and other professional services. … STR's affiliates, officers, directors and employees may also have bought or may buy the shares discussed in this opinion and may profit in the event of a rise in value."

41.     These statements were materially false or misleading.  As alleged above, Stock Trend Report was a nonexistent, fictional enterprise.  Moreover, the compensation that the Promoters had received for the "dissemination of this advertisement" and other promotional

efforts, including the manipulative trading, consisted of sixty percent of RVNG's purportedly unrestricted stock – and the mailer itself was financed with the proceeds from the sale of that stock.  Moreover, the disclaimer that Stock Trend Report "may have bought" or "may buy" RVNG shares was also misleading, as most of the Promoters' shares had been received at no cost and had already been partially liquidated to finance the promotional campaign.

42.     In July 2007, the Promoters also placed paid advertisements for RVNG in multiple major publications.  The advertisements were, in substance, condensed versions of the RVNG Mailer and contained many of the same materially false or misleading statements, including the attribution of the advertisements to the nonexistent Stock Trend Report, the misleading touting of the stock's recent performance, and a disclaimer identical to that in the RVNG Mailer.

43.     Taxon and Cohen collaborated with the Trader in the creation and distribution of the RVNG Mailer and the RVNG advertising materials, and they knew or were reckless in not knowing that the RVNG Mailer and the advertisements contained the materially false or misleading statements as alleged above.

### 3.     **Press Releases**

44.     It was understood among the RVNG Owners and the Promoters that, for their stock promotion campaign to succeed, the issuer should disclose a string of "positive events" during the promotion.  Thus, throughout June and July 2007, the RVNG Owners supported the stock promotion campaign with a steady stream of RVNG press releases.

45.     RVNG issued a total of thirteen press releases during this time period: five in June and eight in July.  Of those thirteen releases, five announced purported arrivals of new officers and directors, and the remaining eight vaguely touted purported developments in RVNG's

12

exploration business, such as plans to "commence general exploration at La Currita, Mexico,

within the next 21 days," the commissioning of a "detailed 'Phase 1 Exploration Program' at La

Currita," receipt of certain initial sample results, and discovery of a "New Parallel Mineralized

Vein Structure." The RVNG Owners and the Promoters coordinated the timing and number of

these press releases, and the press releases were intended to and did support the Promoters'

ongoing market manipulation scheme.

46.     By taking the steps described above, the Promoters successfully manipulated the

market for RVNG stock. Until May 31, 2007, RVNG traded at prices not exceeding $0.80 per

share and with minimal volume, with no trading occurring on many days. Starting on May 31,

2007, the daily price and especially the daily volume went up dramatically – only to decline as

soon as the promotion was complete. The summary chart below demonstrates the dramatic

manipulative effect of the promotion on the market for RVNG stock.

| Time Period | Average Daily Volume | Daily Closing Price – Low | Daily Closing Price – High | Average Price |
|---|---|---|---|---|
| Before Promotion 3/6/07 – 5/30/07* | 40,372 | $0.61 | $0.85 | $0.72376 |
| During Promotion 5/31/07 – 7/31/07 | 2,090,667 | $0.83 | $1.73 | $1.32158 |
| After Promotion 8/1/07 – 12/31/07 | 148,833 | $0.57 | $1.24 | $0.89907 |

* Starting after 2:1 stock split and receipt of new symbol RVNG.OB.

47.     Because Taxon, Cohen and the Trader obtained RVNG stock from the persons

controlling the issuer, with a view to selling it to the public, Taxon, Cohen and the Trader were

statutory underwriters under the Securities Act. Yet no registration statement was filed or in

effect with respect to their sales of RVNG stock.

48.     The selling of unregistered RVNG stock by Taxon, Cohen and the Trader generated an estimated five million dollars in gross proceeds. The Promoters' net profits from the RVNG scheme, however, were more modest – largely because Taxon and Cohen continued to buy RVNG stock too long after the advertising campaign ended, trying in vain to manipulate the stock price higher. Indeed, Taxon and Cohen ultimately ended up sustaining a net loss on their involvement in the RVNG scheme – but, as alleged below, their payout from the KYUS scheme more than offset that loss.

## II.     THE KYUS SCHEME

### A.     KYUS Corporate Background

49.     KYUS was incorporated in Delaware in or about September 2006, under the name Las Rocas Mining Corp. ("Las Rocas"). In its public filings, the company claimed that its "principal business plan was to acquire, explore and develop mineral properties and to ultimately seek earnings by exploiting the mineral claims." In fact, the company was a shell formed and controlled by its purported founder (who was also its sole officer and director) and his relatives (together, "KYUS Shell Sellers").

50.     In March 2007, the company filed with the Commission Form SB-2, a registration statement covering a purported public offering of one million common shares, at $0.025 per share, for total offering proceeds of $25,000. The registration statement became effective in or about June 2007. The one million shares covered by the registration statement were sold in or about June 2007 to friends and acquaintances of the KYUS Shell Sellers. These friends and acquaintances were mere nominees of the KYUS Shell Sellers, and at all relevant times, the KYUS Shell Sellers retained control over the shares.

51.     After the purported public offering, the company had three million common shares issued and outstanding:  two million restricted shares, previously issued to Las Rocas' sole officer and director, and one million purportedly unrestricted shares distributed in the June 2007 offering and controlled by the KYUS Shell Sellers.

52.     On or about October 15, 2007, as alleged in greater detail below, Adam S. Gottbetter, a New York microcap lawyer ( "Gottbetter"), arranged the purchase of the Las Rocas shell from the KYUS Shell Sellers for $760,000 contributed by Taxon and Cohen, the Trader, Gottbetter, and Gottbetter's business partner in the KYUS deal ("Gottbetter's KYUS Partner").

53.     Shortly thereafter, on or about October 26, 2007, Las Rocas announced that it had changed its name to Kentucky USA Energy, Inc., and that it was in merger discussions with a private company called KY USA Energy, Inc. ("Privco"); the merger ultimately closed on May 2, 2008.

54.     In late November 2007, and pre-merger, the newly renamed KYUS effected a 12:1 stock split, after which the company had 36 million shares issued and outstanding:  24 million restricted shares held by its purported founder and 12 million purportedly unrestricted shares that, as a result of the shell purchase described in detail below, were controlled by Gottbetter, Gottbetter's KYUS Partner, and the Trader.

55.     On or about November 20, 2007, the KYUS common stock began trading on the OTCBB under its new symbol, "KYUS."

**B.      The KYUS Stock Promotion Deal**

56.     In the summer of 2007, Gottbetter and Gottbetter's KYUS Partner became acquainted with the Trader and invited him to participate in the KYUS "deal."  Over the course of multiple meetings and conversations, it was agreed that the Trader, working with his partners

(that is, Taxon and Cohen), would (1) "build the chart" for the KYUS stock – that is, create seemingly attractive price and volume history for the stock by means of manipulative trading; (2) distribute a promotional mailer touting the stock, including its seemingly favorable price and volume history; and (3) fund the promotional mailing with proceeds from selling KYUS stock in the open market.  It was further agreed that, for the purpose of perpetrating this scheme, Gottbetter would arrange for the Trader to obtain control of a substantial block of purportedly unrestricted KYUS stock.

57.     The Trader, in turn, invited Taxon and Cohen to participate in the "deal."  Unlike the RVNG Owners, who provided unrestricted RVNG stock to the Promoters at no cost, Gottbetter insisted that the Trader and his partners purchase KYUS stock in private transactions for $604,000.  Taxon and Cohen agreed to split this upfront cost with the Trader and transferred $300,000 to the Trader for use in the deal.  The Trader then transferred Taxon and Cohen's $300,000 and an additional $304,000 from his own offshore accounts to Gottbetter as payment for seventy-five percent of KYUS's purportedly unrestricted common shares.  The remaining twenty-five percent of the purportedly unrestricted shares were transferred to Gottbetter and Gottbetter's KYUS Partner.

58.     Taxon and Cohen knew or were reckless in not knowing that their payment of $300,000 would be used to fund manipulative trading and, indirectly, a fraudulent promotional campaign.

59.     As in the RVNG scheme, in the KYUS scheme, the Promoters' allocation of the purportedly unrestricted KYUS stock was directed to accounts in the names of nominee entities ("Nominee Entities"), rather than to accounts held in the Promoters' own names.  By depositing their shares in the Nominee Entities' accounts – in this case, accounts of three offshore and one

16

domestic brokerage firms – the Promoters obscured their connection to the stock and the upcoming market manipulation.

**C.**   **Manipulative Trading and Fraudulent Promotion of KYUS Stock**

60.   Similar to the RVNG promotion, the KYUS promotion had two components: manipulative trading, which began in November 2007, and a promotional mailer, which the Trader created and distributed in May 2008, shortly after the merger of the KYUS shell with KYUS Privco.

61.   Immediately after receiving their KYUS shares into the Nominee Entities' accounts in late 2007, the Promoters began "building the chart" for KYUS stock, in preparation for the distribution of the promotional mailer and the ultimate sell-off that they executed in May 2008, once the promotion worked to inflate the stock's price. The Promoters controlled seventy-five percent of the public float, and on many days between late 2007 and May 2008, most and sometimes even all of the market activity in the stock was generated by accounts that they controlled.

62.   Among other things, the Trader executed matched trades between the Nominee Entities' accounts and accounts in the names of the Trader's friends and family members that the Trader controlled. The Trader also asked some of his acquaintances among penny stock traders to buy KYUS stock in the open market (in substance, from the Trader), based on the understanding that the Trader would be promoting the stock and would give his "buyers" a heads-up about the upcoming promotion, enabling them to sell the stock at a high price.

63.   The matched trades and the efforts to "bring in buyers" described above had the same twin goals. First, KYUS stock sales generated the cash that the Trader would later use to fund the KYUS promotional mailing. Second, through these actions, the Trader was delivering

on his promise to "build the chart" for the KYUS stock, by creating the false appearance of broad market demand and gradually inflating the price.

64.    Although the Trader played the leading role in executing manipulative trades in KYUS stock, Taxon took an active part in this aspect of the scheme as well.  For example, Taxon had online access to some of the accounts that the Trader used to execute manipulative trades in KYUS stock and at certain times assisted with the trading, while staying in close contact with the Trader by telephone or via online chats.

65.    In addition, between May 2 and 19, 2008, Taxon placed a series of bids on KYUS stock through Taxon and Cohen's offshore account that the Trader could not access.  These bids, placed at progressively increasing prices and each time routed to multiple market-makers, were intended to amplify the appearance of broad market interest in the KYUS stock and to advance the manipulative scheme.

66.    In or about May 2008, shortly after the KYUS merger closed, the Trader distributed by mail a glossy promotional mailer touting KYUS.  The promotional mailer took the form of an eight-page "newsletter" distributed under the fake name Global Investor Watch.  The mailer touted KYUS stock's seemingly attractive – but contrived – recent stock price history and claimed, falsely, that it had been funded by a $2.4 million payment from a fictional entity called Green Century Capital.  In fact, the Trader funded the KYUS Mailer with proceeds from selling the Promoters' KYUS stock.  Although the Trader took the lead in creating the KYUS Mailer, Taxon and Cohen reviewed the Mailer before its distribution.

67.    Taxon and Cohen knew or were reckless in not knowing that the KYUS Mailer, whose creation and distribution they had helped fund, contained materially false or misleading statements, including false attribution, as alleged above.

18

68.     The manipulation and fraudulent promotion of KYUS stock were successful. Between late 2007, when the scheme began, and May 2, 2008, the day of the KYUS merger, the stock price rose from $0.69 per share to $1.70 per share.  Once the mailer had been disseminated, the stock price soared in May 2008, reaching $3.97 on May 23, 2008.  The volume also increased dramatically.  While on all but one day before May 9, 2008, daily trading volume was below 100,000 shares, on each day between May 14 and June 2, 2008, the daily volume was over one million shares, and it reached a high of over 4.4 million shares on May 23, 2008.

69.     In late May and early June of 2008, the Trader transferred $1.2 million in cash to each of Taxon and Cohen.  These funds represented Taxon's and Cohen's share of the scheme's proceeds.

### FIRST CLAIM FOR RELIEF
### Violations of Sections 5(a) and 5(c) of the Securities Act

70.     Paragraphs 1 through 69 are incorporated by reference as if set forth fully herein.

71.     By virtue of the foregoing, Taxon and Cohen, directly or indirectly, singly or in concert with others, made use of the means or instruments of transportation or communication in interstate commerce, or of the mails, to offer and sell securities through the use or medium of a prospectus or otherwise, or carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, securities for the purpose of sale or for delivery after sale, when no registration statement had been filed or was in effect as to such securities and when no exemption from registration was applicable.

72.     By virtue of the foregoing, Taxon and Cohen violated and, unless restrained and enjoined, will continue violating, Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) & (c).

## SECOND CLAIM FOR RELIEF
### Violations of Section 17(a) of the Securities Act

73.     Paragraphs 1 through 69 are incorporated by reference as if set forth fully herein.

74.     By virtue of the foregoing, Taxon and Cohen, directly or indirectly, singly or in concert with others, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, in the offer or sale of securities, with scienter:  (1) employed devices, schemes, or artifices to defraud;  (2) obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (3) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers.

75.     By virtue of the foregoing, Taxon and Cohen violated and, unless restrained and enjoined, will continue violating, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

## THIRD CLAIM FOR RELIEF
### Aiding and Abetting Violations of Section 10(b)
### of the Exchange Act and Rule 10b-5(b) Thereunder

76.     Paragraphs 1 through 69 are incorporated by reference as if set forth fully herein.

77.     By virtue of the foregoing, Taxon and Cohen, directly or indirectly, provided knowing and substantial assistance to persons who, directly or indirectly, singly or in concert with others, in connection with the purchase or sale of a security, with scienter, used the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange to make untrue statements of a material fact or to omit to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

78.     By virtue of the foregoing, Taxon and Cohen aided and abetted and, unless restrained and enjoined, will continue aiding and abetting, violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. §§ 240.10b-5(b), in violation of Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e).

**FOURTH CLAIM FOR RELIEF**
**Violations and Aiding and Abetting  Violations of Section 10(b)**
**of the Exchange Act and Rules 10b-5(a) and 10b-5(c) Thereunder**

79.     Paragraphs 1 through 69 are incorporated by reference as if set forth fully herein.

80.     By virtue of the foregoing, Taxon and Cohen, directly or indirectly, singly or in concert with others, in connection with the purchase or sale of a security, with scienter, used the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange to employ devices, schemes, or artifices to defraud; and to engage in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon others.

81.     By virtue of the foregoing, Taxon and Cohen violated and, unless restrained and enjoined, will continue violating, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a) and 10b-5(c) thereunder, 17 C.F.R. §§ 240.10b-5(a), 240.10b-5(c).

82.     In the alternative, by virtue of the foregoing, Taxon and Cohen provided knowing and substantial assistance to persons who, directly or indirectly, singly or in concert with others, in connection with the purchase or sale of a security, with scienter, used the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange to employ devices, schemes, or artifices to defraud, and to engage in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon others.

83.   By virtue of the foregoing, Taxon and Cohen aided and abetted and, unless restrained and enjoined, will continue aiding and abetting, violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a) and 10b-5(c) thereunder, 17 C.F.R. §§ 240.10b-5(a), 240.10b-5(c), in violation of Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e).

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

### I.

Permanently restraining and enjoining Taxon and Cohen, their agents, servants, employees, attorneys and other persons in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise, from violating Sections 5(a), 5(c), and 17(a) of the Securities Act, 15 U.S.C. §§ 77e(a), 77e(c), and 77q(a), and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

### II.

Ordering Taxon and Cohen to provide accountings and to disgorge their ill-gotten gains received as a result of the conduct alleged herein, plus prejudgment interest thereon.

### III.

Ordering Taxon and Cohen to pay civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

**IV.**

Permanently prohibiting Taxon and Cohen from participating in any offering of penny

stock pursuant to Section 20(g) of the Securities Act, 15 U.S.C. § 77t(g), and Section 21(d)(6) of

the Exchange Act, 15 U.S.C. § 78u(d)(6).

**V.**

Granting such other and further relief as this Court deems just and appropriate.

Dated: May 28, 2015
     New York, New York

                        SECURITIES AND EXCHANGE COMMISSION

                        By: _____
                            Andrew M. Calamari
                            Regional Director
                        SECURITIES AND EXCHANGE COMMISSION
                        Brookfield Place, 200 Vesey Street
                        New York, New York 10281-1022
                        (212) 336-1023 (Brown)
                        Attorney for Plaintiff

Of Counsel:
Thomas P. Smith, Jr.
Nancy A. Brown
Simona K. Suh

23

## LOCAL CIVIL RULE 11.2 CERTIFICATION

Pursuant to Local Civil Rule 11.2, I certify that the matter in controversy alleged against the Defendants in the foregoing Complaint is not the subject of any other civil action pending in any court, or of any pending arbitration or administrative proceeding. A related civil case involving the Commission's claims against Adam S. Gottbetter arising out of the KYUS scheme (SEC v. Gottbetter, et al., 15-CV-3528 (JLL)) and a related criminal case against defendant Itamar Cohen (United States v. Cohen, 15-CR-248 (JLL)) are currently pending before this Court.

SECURITIES AND EXCHANGE COMMISSION

By:  _____

Andrew M. Calamari
Regional Director
SECURITIES AND EXCHANGE COMMISSION
Brookfield Place, 200 Vesey Street
New York, New York 10281-1022
(212) 336-1023 (Brown)
Attorney for Plaintiff

Of Counsel:
Thomas P. Smith, Jr.
Nancy A. Brown
Simona K. Suh

## DESIGNATION PURSUANT TO LOCAL CIVIL RULE 101.1(f)

Per the requirements of Local Civil Rule 101.1(f), the undersigned hereby designates the

United States Attorney for the District of New Jersey to receive service of all notices or papers in

this action at the following address:

Chief, Civil Division
United States Attorney's Office
District of New Jersey
970 Broad Street, Ste. 700
Newark, New Jersey 07102

SECURITIES AND EXCHANGE COMMISSION

By: _____

Andrew M. Calamari
Regional Director
SECURITIES AND EXCHANGE COMMISSION
Brookfield Place, 200 Vesey Street
New York, New York 10281-1022
(212) 336-1023 (Brown)
Attorney for Plaintiff

Of Counsel:
Thomas P. Smith, Jr.
Nancy A. Brown
Simona K. Suh